# SUPREME COURT OF TEXAS.

## GALVESTON TERM, 1859.

---

JOHN S. HOLT, SEN. AND OTHERS v. BENJAMIN S. PARSONS.*

A resolution adopted by a board of trustees, asserting in effect, that B. S. P., their former treasurer, had, as such, collected the funds due to the church of which they were trustees, resigned the office of treasurer, retained all the funds collected as aforesaid, and applied them to his own use and account; and, though remonstrated with, on account of his acts and doings, had wholly disregarded the efforts of the board, to bring about an amicable adjustment of their affairs; wherefore the board censured his conduct, and pronounced him a defaulter to the church in the sum of one hundred and twenty-four dollars and twenty-five cents; is calculated to bring him into disrepute with his neighbors; and, if made and published maliciously, will unquestionably constitute a libel.

A malicious intent on the part of the defendant who makes or publishes the writing complained of, is a necessary ingredient, to support an action for libel, and is one of the facts to be found by the jury; yet, where the writing is defamatory and found to be false, that is evidence of the malicious intent.

In order to weaken or counteract a *primâ facie* case of malice, thus established,

---

* This case was decided at Galveston, on the 22d day of March, 1858, and consequently should have been reported in the twenty-first volume of Texas Reports, but in consequence of the application for a rehearing made shortly thereafter at Tyler, the transcript was carried to the latter place, and was not delivered to Mr. *Hartley*, with the records of the Tyler term. The record was sought for among the transcripts at Tyler, on the suggestion to us of the members of the court, and there found, but too late to be inserted in the twenty-second volume of the Reports.—REPORTERS.

2

Holt v. Parsons.

evidence is admissible to show that it was a privileged communication ; but to rebut and entirely remove the inference of malicious intent, (where the writing is both defamatory and false,) upon the ground of a privileged communication, it must appear : 1st, That the party had a right, or was under some obligation to give the information, which was believed to be true. 2d, The mode and style of communication must not contain intrinsic evidence of malicious intent, over and above what is reasonably necessary and proper in conveying the information. 3d, It must be free from attendant and concomitant extrinsic circumstances, showing a malicious intent.

Where the evidence showed none of the grounds above specified for rebutting the inference of a malicious intent, *held*, that it was not error to refuse to give charges asked for by the defendants, presenting the defence of having made and published the writing in question as a privileged communication without malice, and requiring proof by the plaintiff of express malice on the part of the defendants.

The fact, that the defendants, who adopted the resolution, were members of a board of trustees for the church, did not afford such an occasion, nor give them such authority, (they having the management only of the secular affairs of the church, the plaintiff being no longer a member nor treasurer of the board, and they having no cognizance over any matters pertaining to church discipline,) as to make privileged the censure, or defamatory statement contained in the resolution ; and a demurrer to the answer of the defendants, as a plea of privilege, excepted to, because of such want of authority, was properly sustained as to privilege, and proof, therefore, not required to be made by the plaintiff, of express malice on the part of the defendants.

ERROR from Galveston. Tried below before the Hon. Nelson H. Munger.

This suit was brought on the 22d day of October, 1853, by the defendant in error against John S. Holt, Sen., D. D. Atchison, E. P. Hunt, plaintiffs in error, and John Robertson, for an alleged libel, claiming $5000 damages.

The petition alleged that, on and prior to the 16th day of July, 1852, the plaintiff was, and had been a member, and the treasurer of the Galveston Presbyterian Church, and on that day, his resignation, as treasurer, was accepted by the board of trustees of the church, of which board the defendants were members. It further charged, that on the 26th day of October, 1852, the defendants "falsely, wickedly and maliciously, did compose and publish, and cause and procure to be published, of and concerning your petitioner, and concerning his conduct as treasurer

aforesaid, a false, scandalous, malicious, and defamatory libel, containing the false, scandalous, malicious, and defamatory matter following:" [Here followed the writing set forth in the opinion as the foundation of the action.]

By an amendment to his petition, the plaintiff alleged that the board of trustees was not required, by the regulations of the church, to be composed of the members thereof; that their power and duty was confined to the secular affairs of the church, and that the board had no authority to try, censure or reprimand a member of the church for misconduct, such power being vested in the session of the church, composed of its elders and pastor.

The defendants filed a demurrer, and assigned as special causes : 1. That the act complained of was that of a body corporate, viz., the "Board of Trustees of the Galveston Presbyterian Church," and the defendants were not individually responsible for the same. 2. That the acts complained of were official acts, as members of said board of trustees, for which defendants were not personally responsible.

They also filed separate answers, alleging, in substance, that for a long time previous to the 16th day of July, 1852, the plaintiff and the defendants, Holt, Atchison and Robertson, were members of the Galveston Presbyterian Church; that said parties and defendant Hunt, and James Sorley, were trustees appointed by said society to hold its property and transact its business ; that the plaintiff was the secretary and treasurer of the board of trustees, and, as such, accountable to the said trustees for all moneys passing into his hands, and was in duty bound to render to them an account thereof, with the proper vouchers for all expenditures authorized by the said trustees, whenever required. That all of said parties, so being members of the society aforesaid, as trustees of its property, and for business purposes, were liable and bound to regard and obey the laws, rules and usages of the said church; that on the —— day of July, 1852, the plaintiff, disagreeing with the other members of the board, in acting upon some of the business affairs of the church, resigned as trustee, and as secretary and treasurer of the board, which

resignation was accepted. That it being necessary, as the trustees considered, to settle the account of the plaintiff, it was referred to a committee composed of the defendants Robertson, Hunt and Atchison; which committee, at a meeting of the trustees, on the 19th day of July, 1852, submitted a report thereon, stating that the plaintiff had misapplied funds belonging to said church, collected for the rent of pews, which, by the custom and usage of that and other Presbyterian churches, were appropriated and set apart to pay the salary of the clergyman of said church, by his collecting the same, and passing said funds to the credit of the church, in his own unadjusted accounts, although such usage and custom was well known to the plaintiff, and binding upon him. That the defendant Holt, was appointed to call on the plaintiff, and request him to pay over the money collected for the pew rents during the preceding year; that in compliance with the appointment, Holt did call on him, and requested payment, which he refused and neglected to make. That at a meeting of the trustees on the 22d day of July, 1852, the defendant Hunt, and Sorley, were appointed a committee "to audit the account of the plaintiff, rendered by him against the church, and, if practicable, to effect a settlement with him." That on the 13th day of August, 1852, this committee reported, showing a balance to the church, of moneys misapplied, amounting to $124.25; which report was approved by the trustees on the 6th day of October, 1852, and, as defendants in their answer averred, "contains an explanation or statement of the account of the plaintiff, and with the record thereof, and the other proceedings in the matter founded thereon they bring into court, showing the facts aforesaid." That the defendant Holt, at the request of the trustees, and actuated by kindness to the plaintiff, requested him to make an explanation to the trustees, for the purpose of settling the differences between them, but the plaintiff refused to make any. That the trustees having, in vain, called on him to explain his account, produce vouchers, or pay the balance due, and exhausted all means to induce the plaintiff amicably to adjust the dispute, did, on the 25th day of October,

1852, in executing the trust reposed in them by the said church, in good faith, believing the same to be just and true, as they were bound and had a right to do, and without malice or design to injure the plaintiff, and from a sense of duty, adopt the preamble and resolutions complained of as libellous. And that the matters therein contained were not libellous, but true and just, or by them believed to be so; and that the same were never promulgated or communicated, except to members of the church who had an interest therein, and a right to know the same.

The answer also denied all the facts alleged by the plaintiff, which were not admitted in the foregoing answer.

To the answers of the defendants the plaintiff excepted: That they were not good, as pleas of privilege; because it did not appear that the words complained of were uttered on a justifiable occasion; because it did not appear that said Board had power to censure or reprimand the plaintiff, nor to brand or publish him as a defaulter:—their legitimate authority being to order suit against him for the amount claimed, or to accuse him before the session of the church. Also, that said answers were bad, as pleas of justification, because, it was not shown wherein the charges against the plaintiff were untrue.

The court overruled the demurrer of the defendants to the petition; sustained the plaintiff's demurrer, to the answers, as setting up a privileged communication, and overruled it as to the remaining exception.

On the trial, the defendants asked the court to charge the jury: "That if they believed the defendants were acting as trustees of the Galveston Presbyterian Church, and agreeably to a custom of that society, and in good faith, and believing the resolution to be true, and for business purposes only in discharging their trust, passed the resolution complained of as libellous, it was a privileged communication; and in the absence of proof of express malice on the part of the defendants, no action will lie therefor.

"That the passage of the resolution complained of, was not such a publication, as entitles the plaintiff to a recovery.

"That the occasion upon which the resolution, was passed, and the capacity in which the defendants were acting, afford a *primâ facie* justification."

The defendants also asked the court to charge: "That the plaintiff not having proved express malice cannot recover; and that if the defendants prove the contrary, they are discharged." These charges were refused.

The following charge, asked by the defendants, was given by the court: "That if they believe, the matters contained in the resolution have been proven to be true, they should return a verdict for the defendants."

The plaintiff introduced and proved from record book of the board of trustees, the resolution adopted by the board, as set forth in the petition; it was proved that the plaintiff was treasurer of the board, from about the 25th day of January, 1847, until July 16th, 1852, and that he was an elder in the church. That he resigned the office of treasurer; and the accounts with him as treasurer, not being settled, the board appointed the defendant Hunt, and James Sorley, a committee to examine and report the state of the same. From the testimony of Sorley, it appeared, that the committee "commenced with an item of $217, which purported to be a balance due him on settlement of his accounts as treasurer in 1849. The committee not being able to find of what that balance consisted, or that it had ever been approved by the board, he (the witness Sorley), called upon the plaintiff for a statement of the accounts as to this balance." The result of this call, it appeared, was, that the plaintiff stated, he had once furnished the same to the secretary, who had it still, he presumed. The committee not being able to find it, the plaintiff was requested by Sorley to furnish it to him, "as a matter of personal favor, to enable him to report properly upon it, for the action of the board." This the plaintiff declined to do, on account of the labor requisite to make it out. The witness stated, that he asked for details only, and not for vouchers; and also, that there was no evidence before the com-

mittee, except the simple charge of balance due on account, in the usual way of carrying balances forward.

There was no other evidence in the case, showing the state of the accounts between the plaintiff and the board of trustees. But it appeared upon the testimony of Joseph Bates, who had been a trustee from 1848 until some time in 1852, that when he became a member, and when he ceased to be so, the church was indebted to the plaintiff—which fact was a matter of notoriety in the church, concerning which there was no dispute or controversy. This witness, stated, that "whenever Parsons would talk about what the church owed him, he was told that he must wait : that they were only able to provide for current expenses."

It was also proved, that while Parsons was treasurer, he furnished certain materials for making some improvements (building a recess) about the church, the voluntary subscription having been found insufficient. It was stated also, by the last named witness, that Parsons was told, and it was the understanding, that everybody was to be paid before him. He (the plaintiff) had subscribed fifty dollars, and insisted, that this amount, should go against the account for materials furnished, and that he should not pay the money, but he was told he must wait. The course of Parsons in building the recess and making the repairs, and in paying for the same, was not in opposition to, and did not control that of the committee ; there was no difference between him and the committee on the subject. "When witness first became a trustee, Parsons had previously been treasurer and sole elder of the church, and had managed matters pretty much his own way; he seemed disposed to continue this; but the trustees required him to submit to their control. And after this, appropriations of money were made by the board, and his accounts were regularly examined. Knows that Parsons' accounts were regularly reported to the trustees, and met with no objection. Remembers their being read to the congregation."

The witness Sorley, on behalf of the defendants, in his testimony, stated that the matters contained in the preamble and

resolution complained of, were true. On cross-examination, it appeared, that the grounds of his opinion as to the misapplication of funds of the church by the plaintiff, and his default, arose out of the construction he placed upon the appropriation made by him, of moneys collected for pew rent. He stated, that the account rendered by plaintiff, applied all the church funds to his own use and account; that, charging the old debt which plaintiff claimed, he considered applying the funds of the church to his own account. That in the account, the plaintiff gave the church credit for money received by him; there was none received that he knew of that was not credited. That he knew from the plaintiff's account rendered, that he had collected the money due the church; he had himself paid plaintiff his pew rent; yet the account which plaintiff rendered, contained charges for money paid the pastor for his salary. The witness further stated, that it was the usage of Presbyterian churches, to reserve and set apart the rents of the pews for the payment of the pastor's salary. Heard Mr. Parsons, previously to this affair, introduce a verbal resolution at a meeting of the congregation, that the pew rents be so reserved, and set apart for that purpose. The proceedings of the meeting were not reduced to writing. The witness stated, that no payment could properly be made by the treasurer, except by order of the trustees.

The proceedings of the board, of July 19th, 1852, showed that the committee appointed to examine the accounts of the plaintiff, made a report, "showing the balance in the hands of Mr. Parsons, late treasurer, received by him for pew rents, which was intended by the board to be applied to pay the minister's salary; instead of which, the amount was placed at credit of general account of the late treasurer, for claims he has against the church of long standing, and not approved." The result of this was a resolution by the board, that the president thereof should call on the plaintiff, and ask him to pay over what he had received for pew rents for the year 1852, and when he should explain, and the trustees should know, what amount, if any, the

church was indebted to him, that they were ready to make a settlement with him.

The proposed attempt to adjust the account on the basis claimed by the board, resulted in a correspondence from the plaintiff to the board, which was characterized by them as disrespectful. No permanent settlement or adjustment was made of the differences. A lengthy letter from the plaintiff to the board was given in evidence, in which he denied the alleged liability, and insisted that there was neither order nor resolution of the board making special appropriations of moneys in his hands to the benefit of the pastor, nor any understanding to that effect.

Evidence in respect to the constitution and laws of the church, showed that a resolution of the board of trustees, was not a regular mode of preferring a charge before the session of the church. A board of trustees is no part of the organization of a church, and as such are unknown to the church; they are not mentioned in the constitution. No action taken in the board of trustees, constitutes, in itself, a charge or accusation in the course of church discipline, against a member of the church; nor has the board of trustees any authority whatever, to pass judgment, or censure, on a member in the course of church discipline. The trustees are not necessarily church members, and generally some of them are not.

On the 23d of April, 1853, the board of trustees adopted a resolution " that for the purpose of removing, so far as pertains to this board, all obstacles to an amicable settlement of the differences now existing between this board and Mr. Parsons, this board is willing to overlook the irregular manner in which Mr. Parsons dispensed the financial affairs of the church, during his tenure of office, which irregularity was reproved in the report adopted by the board on the 13th August last, and do, hereby, withdraw said reproof, and authorize and instruct the present treasurer to pay to Mr. Parsons the balance he claims to be due him of $42.53."

On the 11th of July, 1853, the board adopted the following resolution: " Whereas, sundry communications have been re-

ceived from Mr. B. S. Parsons, relative to the settlement of his account, lately made with him by our trustees; and whereas, we do unanimously believe that no improper action has been taken by this board; therefore, be it resolved, that we, the board of trustees now convened, do declare the business with Mr. Parsons alluded to, finally closed, and that we decline any further action relative thereto." The testimony, though voluminous, need not be more fully stated. The suit abated as to defendant · Robertson, by his death.

There was a verdict in favor of the plaintiff for one thousand dollars, and judgment rendered accordingly; a motion by the defendants for a new trial was overruled.

The plaintiffs in error assigned as error in the District Court: 1. The overruling of the defendants' demurrer to the plaintiff's petition, and amended petition : 2. The sustaining of the plaintiff's exceptions to the defendants' answers, as pleas of privilege : 3. The refusal of the court to give the instructions asked by the defendants : 4. That the verdict was against the law and the evidence; and the overruling of the motion for a new trial.

*P. C. Tucker, Jr.*, and *F. H. Merriman*, for the plaintiffs in error.

*W. P. Ballinger*, for the defendant in error.

The able briefs of the counsel are omitted on account of their length.

ROBERTS, J.—Mr. Starkie says, that "any writings, pictures, or signs, which derogate from the character of an individual, by imputing to him either bad actions, or vicious principles, or which diminish his respectability and abridge his comforts, by exposing him to disgrace and ridicule, are actionable, without proof of special damage; in short, that an action lies for any false, malicious, and personal imputation, effected by such means, and tending to alter the party's situation in society for the

worse." (Starkie on Slander, 140.) And Sir William Black-stone defines a libel to be the "malicious defamation of any person, made public by writing, &c., in order to provoke him to wrath, or expose him to public hatred, contempt, or ridicule." (4 Bl. Com. 150.)

The writing alleged to be maliciously published in this case, is as follows, (being a resolution adopted and recorded by the defendants as a board of trustees) :

"Whereas, Benjamin S. Parsons, former treasurer of the Galveston Presbyterian Church, did, as treasurer, collect the funds due to said church, and whereas, the said Benjamin S. Parsons did resign the office of treasurer, and did, at the same time, retain all the funds collected as aforesaid, applying them to his own use and account ; and whereas, the said Parsons has been often remonstrated with, on account of his acts and doings in relation to said funds ; and whereas, he has wholly disre-garded our efforts to bring about an amicable adjustment of our affairs ; and whereas, he has written to the Board of Trustees various disrespectful communications ; therefore, be it resolved, unanimously, that the Board of Trustees of the Galveston Pres-byterian Church, do censure the conduct of the said Benjamin S. Parsons, and pronounce him a defaulter to the said Presby-terian Church, in the sum of one hundred and twenty-four dollars and twenty-five cents."

The substance of this is, that Parsons is censured for obsti-nately retaining in his hands the funds of the church, which he received as its treasurer, without just cause, after every impor-tunity had been exhausted, to induce him honestly to pay it over. Such an assertion is certainly calculated to bring him into disrepute with his neighbors ; and being charged to have been made and published maliciously, would unquestionably con-stitute a libel, under the definition above given.

The defendants below denied the malicious intent, and as-serted the truth of the facts contained in the resolution. The verdict of the jury established the falsity of the charge against Parsons, upon evidence which appears to be entirely sufficient.

The defendants below contend that it was in the nature of a privileged communication, and that, although it might not have been true, they believing it to be so, and having acted without any malicious intent, it is not libellous. This would have been a good defence had it been supported by proof.

The malicious intent is a necessary ingredient in the cause of action, and is one of the facts to be found by the jury. Where the writing is defamatory in its character, and is found to be false, that is evidence of the malicious intent, because every one is presumed to have intended what is the necessary consequence of his own act. That evidence (which is usually stated to be *primâ facie*) may be weakened, and sometimes wholly counteracted, by its being a privileged communication. For instance, a letter is written, in England, concerning a servant, both defamatory and untrue. The fact that it was written as a letter of character by a former master, tends to rebut the presumption of malicious intent that would otherwise arise, and it will counteract it altogether, unless there is something in the style or manner of the writing which shows malice. It may still bear upon its face intrinsic evidence of a malicious intent, although it be the letter of the master; or, this malicious intent of the master, although not apparent in the writing, may be made manifest by extrinsic facts.

To rebut and entirely remove the evidence of malicious intent, where the writing is both defamatory and false, upon the ground of a privileged communication, it must appear: 1st, That the party had a right, or was under some obligation, to give the information which was believed to be true: 2nd, The mode and style of communication must not contain intrinsic evidence of malicious intent over and above what is reasonably necessary and proper in conveying the information: 3d, It must be free from attendant and concomitant extrinsic circumstances showing a malicious intent. (Starkie on Slander, 201-212, and particularly, case of Dunman v. Bigg, cited on page 210 ; 1 Campb. R. 269.) These general principles have been discussed and settled

with great ability and research in the case of Root v. King and Verplank, 7 Cowen's Rep. 613.

The proof here does not show such a case. The board of trustees had no moral control over the former treasurer. Their relation to him was one of a business character. They had a right to form and declare their judgment as to the state of accounts between the treasurer and the board. This they had done by a previous resolution. This was as far as it was necessary and proper for any practical purpose. The tone and spirit of the resolution show that something more was designed by it, than merely to inform the church members that Parsons was indebted to the church one hundred and twenty-four dollars, and that he refused to pay it. The interviews and communications, both before and after the resolution was passed, show a disagreement of a serious and protracted character between the committee and Parsons to have existed at the time, and may have been regarded by the jury as furnishing extrinsic evidence of the malicious intent. But had there been none such, the court, from the tone of the resolution, should have left it to the jury to determine (as was done in the case of Dunman v. Bigg, above cited,) whether the expressions in the resolutions were used with a malicious intention of defaming the plaintiff (below), or with good faith to communicate facts to the church members, in relation to the pecuniary affairs under their charge.

From the views here taken, it will be perceived, that the court below did not err in refusing the charges asked by plaintiffs in error; and that the defence relied on, that the resolution was in the nature of a privileged communication, is not sustained by the evidence.

Judgment affirmed.